**AIKEN SCHENK HAWKINS & RICCIARDI P.C.**
2390 East Camelback Road, Suite 400
Phoenix, Arizona  85016
Telephone:  (602) 248-8203
Facsimile:  (602) 248-8840
E-Mail:  prr@ashrlaw.com

**Philip R. Rupprecht - 009288**
**Erin Ford - 027240**
Attorneys for Plaintiff

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| IdealPro Software, LLC, an Arizona limited liability company<br><br>Plaintiff,<br><br>v.<br><br>Furtmann Bros., LLC, an Arizona limited liability company; Mark Furtmann and Gina Furtmann, husband and wife; Michael Furtmann and Lori Furtmann, husband and wife; Does I to X<br><br>Defendants. | Case No.<br><br>**COMPLAINT**<br><br>(Copyright Infringement; Violation of the DMCA; Unauthorized Access to Electronic Communications; Unauthorized Computer Access; Breach of Contract) |

Plaintiff IdealPro Software, LLC alleges:

## PARTIES

1.      Plaintiff IdealPro Software, LLC ("IdealPro") is an Arizona limited liability company having its principal place of business in Maricopa County, Arizona.

2.      Defendant Furtmann Bros. LLC ("Furtmann LLC") is a limited liability company organized under laws of the Arizona having its principal place of business at 5742 West Maryland Avenue, Glendale, Arizona 85301.

3.      Defendant Michael Furtmann is a married resident of Maricopa County Arizona.  Defendant Lori Furtmann is the spouse of Michael Furtmann.  Michael Furtmann is an agent and employee of Furtmann LLC.

4.      Defendant Mark Furtmann is a married resident of Maricopa County Arizona.  Defendant Gina Furtmann is the spouse of Mark Furtmann. Mark Furtmann is

the manager of Furtmann LLC.  Mark Furtmann is an agent and employee of Furtmann LLC.

5. Does I to X are persons or entities that assisted the other defendants in committing the acts and events described in this complaint.

6. All of the acts and events alleged in this complaint on behalf of married persons were taken for the benefit of their respective marital communities.

## JURISDICTION AND VENUE

7. This civil action asserts a claim under the Copyright Act, 17 U.S.C. §101, for copyright piracy and infringement.

8. This civil action also asserts a claim under the Digital Millennium Copyright Act, 17 U.S.C. §1201.

9. This Court has subject matter jurisdiction over both the Copyright Act claim and the Digital Millennium Copyright Act claims pursuant to 28 U.S.C. §1331 and 28 U.S.C. §1338(a).

10. This Court has subject matter jurisdiction over the Stored Communications Act claims under 28 U.S.C. §1331.

11. This Court has supplementary jurisdiction over all other claims pursuant to 28 U.S.C. §1367 because such claims are so related to the claims for which this Court has original jurisdiction that they form a part of the same case or controversy.

12. Defendants are subject to personal jurisdiction in this Court because Defendants all reside in Arizona, have continuous systematic contact with Arizona, purposely availed themselves of the privilege of conducting business in Arizona, or have their principal place of business or residence in Arizona.  The allegations in this complaint arise out of and relate to Defendants forum related activities and, therefore, it is reasonable for this Court to exercise personal jurisdiction over the Defendants.

13. This judicial district is proper pursuant to 28 U.S.C. §1391(b).

## THE IDEALPRO COPYRIGHTED WORKS

14.   Plaintiff IdealPro is a software company that develops and licenses proprietary software known as the IDEAL Scheduling Program or just "IDEAL." IDEAL is a unique and valuable construction management computer application which integrates a contractor's estimating, job costing, scheduling, and purchasing functions into one seamless environment. Contractors running IDEAL have a significant advantage over their competitors in that they are able to closely track their job costs and profitability on multiple variations of similar projects. Contractors running IDEAL have a better understanding of their job profitability and can adapt quickly to changes in the market.

15.   IDEAL is a customized relational database application which runs on Microsoft's SQL Server Operating System. IDEAL has two primary components. A portion of the IDEAL software resides on a central computer, or server, running the SQL Server Operating System. The portion of IDEAL that sits on the SQL server works as a hub accessible by multiple individual work stations. The other portion of IDEAL sits on the individual work stations.

16.   Users at work stations enter business data to build a database (the "Database") unique to their company. Because the Database resides on the central SQL server, other users in the same company can then access that Database, using the workstation resident IDEAL, to perform a variety of standard business tasks.

17.   IDEAL is used initially to estimate the costs of a construction project. If the contractor's bid is successful. IDEAL will then generate purchase orders based on the estimates. Given a start date, it will produce a construction schedule, invoices, job cost reports and even export data to the company's accounting software. For companies in the homebuilding trades, it will track labor and material needs not just by floor plan, but by model and lot as well.

18. Employees at an IdealPro licensed company can access information and generate reports unique to their function—purchasing, scheduling, accounting and the like.

19. The portion of IDEAL resident on the SQL Server defines the parameters of the Database and, in general, controls the flow of information into and out of the Database. The portion of IDEAL resident on the work stations defines and controls, in general, the creation, presentation, content and display of that information.

20. Plaintiff is the registered owner of the copyright for IDEAL. Exhibit B.

### IDEALPRO LICENSE AND TERMINATION

21. On or about January 1, 2007, Furtmann LLC entered into an IDEAL license agreement with Plaintiff (the "License"). A true and correct copy of that agreement is attached to this Complaint as Exhibit A. Plaintiff was formerly known as Bebout Technology, LLC, but changed its name.

22. Pursuant to the terms of the License, Furtmann LLC was granted a personal, not exclusive, non-transferable right to install and use IDEAL in machine readable form, in Arizona subject to the terms of the License. (Paragraph 1). The License prohibits Furtmann LLC from copying, distributing, modifying, adapting, reverse engineering or otherwise copying IDEAL. (Paragraph 2c).

23. Under the terms of the License, title and ownership to IDEAL and all copyrights remained, at all times, with Plaintiff.

24. IDEAL was originally licensed for 1 year, but was subject to automatic renewals for successive one year periods until either party gave written notice of termination at least 60 days prior to the commencement of any new renewal term. (Paragraph 7a).

25. On October 29, 2012, Plaintiff notified Furtmann LLC of its nonrenewal of the License beyond the end of December 31, 2012.

4

26. On December 12, 2012, Plaintiff and Furtmann LLC extended the License for an additional month through January 31, 2013.

27. On January 31, 2013, Plaintiff and Furtmann LLC extended the license for an additional period into February 2013.

28. Furtmann LLC's License of IDEAL has now terminated.

29. At the inception of the License in 2007, there was a degree of common ownership between Plaintiff and Furtmann LLC. As a result, Plaintiff also provided, free of charge, computer network equipment of considerable value to Furtmann LLC. In February 2013, Plaintiff maintained a total of seven severs at Furtmann LLC's offices (collectively the "Servers"). One of the Servers ran the Furtmann LLC licensed IDEAL/SQL Database (the "SQL Server").

30. Another Server hosted Furtmann LLC's email. Another Server, the "Domain Server", maintained most of Furtmann LLC's electronic records.

31. Most of the Servers located at Furtmann LLC were used exclusively by or for Furtmann LLC. The Domain Server also maintained the electronic business records of Plaintiff and Plaintiff's affiliates. During the term of the License, Plaintiff and its affiliates used a portion of the other eServers to host unrelated email exchange services, unrelated domain services and IDEAL development (the "Non-Furtmann Servers"). Confidential passwords prevented Furtmann LLC's access to the Non-Furtmann Servers.

32. Plaintiff and its affiliates accessed the Non-Furtmann Servers remotely with no disruption to or impact on Furtmann LLC and its business operations.

33. At the conclusion of the License, IDEAL contained a so called "kill switch". The kill switch was a software feature written into IDEAL so that it would not function beyond on a certain date.

34. Plaintiff rolled back the kill switch date as the License was extended in late 2012 and 2013.

35. The kill switch was written into IDEAL as a mechanism to protect Plaintiff's copyrights and intellectual property rights in IDEAL and to prevent the use of IDEAL beyond the expiration of the License.

### **DEFENDANTS' INFRINGEMENT**

36. Most of the machine code for IDEAL was written by Mike Sloan over eighteen months.

37. In October 2008 Sloan left employment at one of Plaintiff's affiliates. From that date until January, 2013, Sloan also acted as Furtmann LLC's network support contractor. As an independent contractor, and not as an employee, Sloan kept Furtmann LLC's computer network running on Plaintiff's equipment. As part of these services, Sloan maintained the Servers including installing updates and software patches as needed.

38. On January 25, 2013, Sloan met with Mike Furtmann at Furtmann LLC's offices and was introduced to Christopher Moore. Sloan was informed that Moore was replacing him. Furtmann LLC's agent Christopher Moore requested that Sloan surrender all network passwords and system credentials. Sloan informed Moore that the Servers were configured so that control of the Furtmann LLC passwords and system credentials did not control access to the IDEAL Server, the Domain Server or any of the Non-Furtmann Servers.

39. Sloan told Moore that much of the Furtmann LLC data was located on the Domain Server and that he couldn't give Moore access to the Domain Server because data, records and files of others were also stored on the Domain Server.

40. Sloan told Moore that Furtmann LLC did not own IDEAL and that there was information on the Non-Furtmann Servers and the Domain Server that did not belong to Furtmann LLC. Sloan made clear that he was not going to give Moore access to the Non-Furtmann Servers and the Domain Server until Moore could satisfy Sloan that Moore was authorized to do so.

6

41. Sloan provided the passwords and system credentials for the portion of the Servers belonging to Furtmann LLC and no others.

42. On January 26, 2013, Moore and others disconnected the Servers from remote access.

43. When Moore logged on to the Furtmann LLC network he discovered that what Sloan had told him was true. Although there were two computer networks running on the hardware in the Furtmann LLC IT room, the Furtmann LLC network had little data or value while the other network, Plaintiff's, controlled access to the Furtmann LLC business data and the IDEAL database and application.

44. Moore asked Mike Furtmann and Mark Furtmann what he should do. He was told to "do whatever it takes."

45. On January 26, 2013, Moore ran a number of password cracking programs, including one called Cain and Abel, on the Domain Server.

46. At the direction and instruction of Mark Furtmann, Moore successfully cracked Mike Sloan's password—the very password that Sloan, the day before, had refused to provide--and logged onto the Domain Server and the SQL Server using the administrative password of Mike Sloan

47. Mike Sloan had held all administrative level passwords under both usernames "MSloan" and "fcsadmin" for the Servers and did not give his passwords to Moore.

48. After logging in as "msloan", Furtmann LLC's agents had unrestricted access to administrative privileges over all the Servers.

49. Furtmann LLC then copied the IDEAL Database and application.

50. Furtmann LLC also copied other data, files, documents and images. Upon information and believe, Furtmann LLC copied Plaintiff's emails and documents onto a Western Digital USB storage device (likely an external hard drive). The full extent of

Defendants' copying activities cannot be known with any certainty because of their spoliation of evidence.

51. After copying IDEAL and probably other non-Furtmann related files and data, Furtmann LLC's agents reconnected the Servers to the internet restoring remote access.

52. On January 27, 2013, Mike Sloan tried to login remotely without success. Sloan called Mike Furtmann about the problem. Mike Furtmann said he would look into it. Later that same day, Sloan remotely logged onto the Servers. He immediately noticed a number of irregularities. Among the irregularities he noticed was that a backup had failed. In addition, he noticed an unauthorized login under his username.

53. Sloan also discovered that someone had backed up the IDEAL Database and software using his name.

54. Concerned that the system had been hacked, Sloan called Plaintiff. Plaintiff requested that Sloan document his observations.

55. Sloan downloaded a portion of the Event Logs for the SQL and Domain Servers (the "Event Logs"). In addition, Sloan took certain "screen shots" of the information available to him when he logged in on January 27th. Based upon his investigation, Sloan concluded that somebody had hacked the SQL Server from the Furtmann LLC offices.

56. After downloading the Event Logs and screen shots, Sloan logged off.

57. When Mike Sloan tried to log back in the following week using new passwords the following week, he found he could not. Upon information and belief, Defendants changed the password for Mike Sloan and the username "msloan" and also changed the passwords for the user "fcsadmin" on all Servers.

58. Defendants' unauthorized access to the administrative level usernames and alteration of the passwords for those usernames was done to prevent Plaintiff and its

agents from preserving evidence of Defendants' infringing activity and to prevent Plaintiff from having access to its electronic records including Plaintiff's emails.

59. With the administrative passwords, Defendants had unrestricted access to the machine code programing for IDEAL.

60. Acting on Mark Furtmann's explicit instructions, Moore and his agents edited the code for IDEAL and took out the kill switch in IDEAL. By circumventing the kill switch, Furtmann LLC has been able to continue to use IDEAL past the expiration of the License.

61. Defendants made at least one unauthorized copy of IDEAL. Defendants could make, and upon information and belief have made, other unauthorized copies of IDEAL.

62. Defendants, upon information and belief, copied emails, documents and records that did not belong to Furtmann LLC and Furtmann LLC had no authorization to review or copy.

63. Does I to V aided or assisted the other Defendants in infringing the copyrighted works.

64. On or about January 30, 2013, Mark Furtmann, the manager of Furtmann LLC met with James P. Bebout the manager of the Plaintiff to discuss, among other things, the events of January 26, 27, and 28.

65. During that conversation, Mark Furtmann admitted that Furtmann LLC copied IDEAL with the purpose and intent of using it past the expiration of the License expiration date.

66. During this meeting, Mark Furtmann made clear that he had no further interest in negotiating an extension of the IDEAL license because, as a practical matter, he no longer needed an extension of the License.

## DEFENDANTS' SPOLIATION OF EVIDENCE

67. On February 5, 2013, counsel for Plaintiff wrote to counsel for Furtmann LLC informing him that the License was set to expire, and that someone had hacked the Servers, copied substantial information and was attempting to modify IDEAL to use it beyond the expiration of the License.

68. When Plaintiff failed to receive any meaningful response from Furtmann LLC, Plaintiff's counsel mailed and emailed a letter demanding that Furtmann LLC preserve and maintain the electronic evidence in a form sufficient to allow it to be discovered. A true and correct copy of this letter is attached as Exhibit C (the "Preservation Letter").

69. The Preservation Letter demanded a response by February 18, 2013. No response was ever received.

70. As a result of these events, Plaintiff retained Experts Insights, PC as its electronic forensic technology consultant.

71. Expert Insights picked up the Servers at Furtmann LLC on March 5, 2013 and shortly thereafter began a forensic review.

72. Expert Insights discovered that, on February 21, 2013, after receipt of the Preservation Letter, a username "fcsadmin" was created on the SQL Server. Eight minutes later, this new user installed a program called C Cleaner upon execution of a file called "CC Setup 327.exe." C Cleaner is a widely available program whose purpose is used to clean electronic information off of computer hard drives. Based upon the information discovered to date, C Cleaner was run on February 24, 2013, and March 1, 2013. In addition, between February 14, 2013 (the date of the Preservation Letter) and March 5, 2013 when the Servers were picked up, Defendants copied multiple programs, copied information to other hard drives, and engaged in substantial additional activities designed to wipe data clean from the Plaintiff's Servers.

73. In addition, Defendants deleted the Event Logs earlier captured by Mike Sloan. Specifically, the Event Logs for the critical days of January 26 and 27, 2013 were erased entirely eliminating evidence of the infringing conduct other than in the copies preserved by Mike Sloan.

74. In the case of the SQL Server, 5 main registry files were either blank or missing material amounts of information indicating that they were deleted.

75. Defendants edited the Event Logs and edited the system registry in an attempt to destroy evidence of their misconduct.

76. Defendants VI to X aided or assisted the other Defendants in spoliating material, relevant evidence.

## COUNT I

## COPYRIGHT PIRACY AND INFRINGEMENT

77. IdealPro is the owner of all right, title and interest in and to copyrighted IDEAL application and its adaptations including, without limitation, all right, title and interest in and to the copyrights associated with the IDEAL application (the "Copyrighted Works").

78. Plaintiff registered its copyright in the Copyrighted Works with the United States Copyright Office at Registration # TX 7-688-933. Exhibit B.

79. As the owner of the Copyrighted Works, IdealPro has certain exclusive rights pursuant to 17 U.S.C. § 106 including, without limitation, to reproduce, prepare derivative works based on and distribute copies of the Copyrighted Works (collectively the "Exclusive Rights").

80. Furtmann LLC, Mike Furtmann, and Mark Furtmann have intentionally and willfully violated, and are continuing to intentionally and willfully violate, IdealPro's Exclusive Rights by directly, vicariously and/or contributorily copying IDEAL and preparing derivative works based on IdealPro's Copyrighted Works, without authorization or approval from IdealPro.

81. Furtmann LLC, Mike Furtmann, and Mark Furtmann have intentionally and willfully violated, and are continuing to intentionally and willfully violate, IdealPro's Exclusive Rights by directly, vicariously and/or contributorily making unauthorized copies of IdealPro's Copyrighted Works without authorization or approval from IdealPro.

82. Upon information and belief, Furtmann LLC, Mike Furtmann, and Mark Furtmann have intentionally and willfully violated, or are continuing to intentionally and willfully violate, IdealPro's Exclusive Rights by inducing others to copy and distribute IdealPro's Copyrighted Works without authorization or approval from IdealPro.

83. Mark, Mike, Lori and Gina Furtmann, have a financial interest in, have profited from, and/or have been unjustly enriched by virtue of the violations of IdealPro's Exclusive Rights in and to the Copyrighted Works.

84. IdealPro invested a substantial sum in the Copyrighted Works and Defendants violations of IdealPro's Exclusive Rights in the Copyrighted Works have damaged IdealPro.

85. As a result of Defendants willful infringement, IdealPro is entitled to an equitable accounting and/or recovery of Defendants' profits, recovery of all damages sustained by IdealPro, and an award of the costs of this action or to recover statutory damages for each infringement, including statutory damages of up to $150,000 for each willful infringement of the Copyrighted Works pursuant to 17 U.S.C. § 504(c).

86. Unless enjoined, Defendants will continue to willfully and intentionally use unauthorized, pirated, and modified copies of the IDEAL application stored on other servers, hard drives or other storage devices thereby causing Plaintiff irreparable harm.

87. Defendants activities have harmed and if not enjoined will irreparably harm Plaintiff IdealPro, and the value and reputation of its Copyrighted Works.

88. By reason of Defendants' acts, IdealPro's damages are inadequate to compensate for the injuries inflicted by Defendants.

89. IdealPro is entitled to injunctive relief pursuant to 17 U.S.C. § 502 and to an order impounding any and all of the infringing materials and all articles by means of which such infringement copies have been reproduced pursuant to 17 U.S.C. § 503.

90. Defendants' acts render Defendants liable for statutory damages and or actual damages by their illegal actions.

91. Plaintiff IdealPro reserves the right to elect statutory damages.

92. IdealPro is entitled to recover its attorney's fees and costs pursuant to 17 U.S.C. § 505.

## COUNT II

## VIOLATIONS OF THE DIGITAL MILLENNIUM COPYRIGHT ACT

93. Plaintiff IdealPro owns the IDEAL application and maintains its Exclusive Rights as defined in 17 U.S.C. § 106 to, *intra alia*, reproduce the Copyrighted Works.

94. Prior to the expiration of the License, Plaintiff installed not less than two electronic security measures designed to prevent unauthorized access to the Copyrighted Works.

95. On January 26, 2013 only Plaintiff and its agent held Server administrative rights. Two usernames, whose passwords were only known to Sloan, held these highest level rights to access the Servers. These usernames "fcsadmin" and "msloan" and only these usernames, held unrestricted rights to the Servers.

96. None of the Defendants had, before January 26, 2013, access to the passwords for these two user names. The administrative level, password protected usernames were an electronic measure designed to prevent access to the machine code for IDEAL, the SQL Server and the Non-Furtmann Servers.

97. In addition, IDEAL contained a self-executing kill switch designed to prevent Furtmann LLC from copying IDEAL, editing it, modifying it, and in particular extending its life beyond the termination of the License. The kill switch was a

technological measure designed to prevent unauthorized access to Plaintiff's Copyrighted Works.

98. Cain and Abel, the program loaded by Defendants is specifically designed to "crack" passwords and therefore circumvent the password authorization process. By installing and then running Cain and Abel, Furtmann LLC circumvented a technological measure that controlled access to a federally protected copyrighted work in violation of Digital Millennium Copyright Act ("DMCA") 17 U.S.C. § 1201(a)(1)(A).

99. After cracking the administrative level passwords, Defendants edited the machine code for Plaintiff's Copyrighted Works and deleted the IDEAL kill switch. With access to the administrative level passwords, Furtmann LLC circumvented the kill switch--a technological measure that controlled access to a federally protected copyrighted work-- in violation of 17 U.S.C. § 1201(a)(1)(A).

100. Mike and Mark Furtmann' s actions were taken without authorization and in a manner that infringed or facilitated infringing a right protected by the Copyright Act..

101. Furtmann LLC is vicariously liable for the conduct of its agents Mike Furtmann and Mark Furtmann.

102. Unless enjoined, Defendants will continue to willfully and intentionally use copies of the IDEAL application which were created after circumventing electronic measures designed to prevent unauthorized access thereby causing Plaintiff irreparable harm.

103. Defendants activities circumventing Plaintiff's electronic security have harmed and if not enjoined will irreparably harm Plaintiff IdealPro and the value and reputation of its Copyrighted Works.

104. By reason of Defendants' acts, IdealPro's damages are inadequate to compensate for the injuries inflicted by Defendants.

105. IdealPro is entitled to injunctive relief pursuant to 17 U.S.C. § 1203(b)(1) and to an order impounding any and all of the infringing materials and all articles by

means of which such infringement copies have been reproduced pursuant to 17 U.S.C. § 1203(b)(2).

106. Defendants circumventing conduct in violation of the DMCA and their spoliation of evidence constitute additional grounds for injunctive relief and impoundment.

## COUNT III

## BREACH OF CONTRACT

107. The License expired no later than February 28, 2013.

108. Upon information and belief, Furtmann LLC has continued to use IDEAL, or a variation of IDEAL, beyond the expiration of the License in violation of the License.

109. Furtmann LLC has breached the License and, as a result, must answer in damages to Plaintiff in an amount to be proven at trial.

## COUNT IV

## UNAUTHORIZED ACCESS TO STORED ELECTRONIC COMMUNICATIONS

110. It is a federal offense to intentionally access without authorization a facility through which an electronic communication service is provided or to exceed the authorization to access that facility and thereby obtain access to electronic communications. 18 U.S.C. § 2701 (a).

111. Pursuant to 18 U.S.C. § 2707, the provider of the service and any person aggrieved by the improper access main sue for damages, injunctive relief, attorneys' fees and costs.

112. In a civil action under 18 U.S.C. § 2707, the Court must assess damages of not less than $1000.  The conduct of Mike Furtmann was intentional entitling Plaintiff to an award of punitive damages.

113. Upon information and belief, Mike Furtmann accessed Plaintiff's email server and thereby gained access to a facility through with electronic communications were transmitted and stored without authorization.

114. Furtmann LLC is vicariously liable for the conduct of its agent Mike Furtmann.

115. Furtmann LLC and Mike Furtmann are liable to Plaintiff for actual damages, profits, punitive damages, costs and attorneys' fees as a result of their intentional violation of 18 U.S.C. § 2701.

## COUNT VI
## UNAUTHORIZED COMPUTER ACCESS

116. It is an offense under the laws of Arizona to, without authority, knowingly access any computer, computer system or network or any computer software, program or data that is contained in a computer, computer system or network. A.R.S. § 13-2316(A)(8).

117. It is an offense under the laws of Arizona to, without authority, knowingly alter, damage, delete or destroy computer programs or data. A.R.S. § 13-2316(A)(2).

118. Mike Furtmann and Mark Furtmann either directly, or through their agents, knowingly and without authorization, gained access to the Servers and data contained on the Servers.

119. Mike Furtmann and Mark Furtmann either directly, or through their agents, knowingly and without authorization, altered, deleted or destroyed computer programs or data on the Servers.

120. Furtmann LLC is vicariously liable for the conduct of its agents Mike Furtmann and Mark Furtmann.

121. Defendants are liable to Plaintiff for damage caused by their violations of Arizona law.

16

## JURY TRIAL REQUEST

Plaintiff, pursuant to Rule 38, Federal Rules of Civil Procedure, respectfully request a trial by jury of all triable issues in this matter.

## PRAYER FOR RELIEF

Plaintiff IdealPro Software, LLC prays for judgment against Defendants as follows:

A. For Plaintiff's actual damages in an amount to be proven at trial

B. For the profits Defendants earned from their unlawful activity

C. For punitive damages where appropriate

D. Alternatively, Plaintiff may elect statutory damages on some or all of its claims

E. For Plaintiff's attorneys fees and costs pursuant to A.R.S. § 12.341.01, 17 U.S.C. § 505, 17 U.S.C. § 1203 and any other applicable statute

F. For an order enjoining Defendants from further infringement of Plaintiff's Copyrighted Works

G. For an order impounding the computers and other devices on which Plaintiff's Copyrighted Works can be found

H. For such other and further relief is just.

DATED this 28th day of June, 2013.

                                                                AIKEN SCHENK HAWKINS & RICCIARDI P.C.

                                                                By s/ Philip R. Rupprecht
                                                                    Philip R. Rupprecht
                                                                    Erin Ford
                                                                    2390 East Camelback Road, Suite 400
                                                                    Phoenix, Arizona 85016
                                                                    Attorneys for Plaintiff

1
2
3 **CERTIFICATE OF SERVICE**
4
5  I hereby certify that on 28th day of June, 2013, I electronically transmitted
6 this document to the Clerk's Office using the CM/ECF System for filing.
7
8  /s/ Joanne Granville
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28